Vess A. Miller, No. 278020
vmiller@cohenmalad.com
Natalie Lyons, No. 293026
nlyons@cohenmalad.com
COHENMALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
Tel: (317) 636-6481

[*additional counsel listed on signature pages*]
Counsel for Plaintiff and the Proposed Class

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOHN DOE individually and on behalf of all others similarly situated,<br><br>Plaintiff<br><br>v.<br><br>CENTENE CORPORATION d/b/a AMBETTER HEALTH<br><br>Defendant. | **Case No. ____________________**<br><br>**CLASS ACTION COMPLAINT FOR:**<br>**1. Negligence**<br>**2. Negligence Per Se**<br>**3. Violation of Comprehensive Computer Data Access and Fraud Act, Cal. Pen. Code § 502**<br>**4. Violation of Consumer Protection Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.***<br>**5. Violation of Consumer Privacy Act, Cal. Civ. Code, §§ 1798.100, *et seq.***<br>**6. Breach of Express and Implied Contract**<br>**7. Unjust Enrichment**<br>**8. Breach of Fiduciary Duty**<br>**9. Declaratory Judgment**<br>**10. Breach of Confidence**<br>**11. Violation of Invasion of Privacy Act, Cal. Pen. Code §§ 631, *et seq.*** |

| | |
|---|---|
| | **12. Violation of Invasion of Privacy Act, Cal. Pen. Code §§ 632, *et seq*.**<br>**13. Violation of Invasion of Privacy Act, Cal. Pen. Code §§ 638, *et seq*.**<br>**14. Violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2511(1), *et seq*.**<br>**15. Violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2511(3)(a), *et seq*.**<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff John Doe individually, and on behalf of all others similarly situated (hereinafter "Plaintiff") brings this Class Action Complaint against Defendant, Centene Corporation d/b/a Ambetter Health ("AH" or "Defendant"), and allege, upon personal knowledge as to their own actions, and upon information and belief as to all other matters, as follows.

## INTRODUCTION

1. This case arises from a fundamental betrayal of trust. Defendant, a major healthcare insurance provider, assured its health insurance customers and other website visitors that their private information would remain confidential. Through its cookie banner, Defendant represented that website visitors could opt out

of cookies and data tracking. In a conspicuous cookie banner on its website,[1] Defendant stated unequivocally: "[y]ou may choose which types of cookies to allow and can change your preferences at any time." These representations were false.

2. In truth, Defendant embedded on its website tracking tools to share visitor information with third parties, including TikTok, Meta/Facebook, Google, The Trade Desk, Undertone, Adobe, Xandr (Microsoft's digital advertising platform), HubSpot, Pontiac Intelligence, CrazyEgg, Qualtics, Invoca, StackAdapt, and Adnxs/AppNexus (collectively the "Third Parties" and their "Trackers") without visitor consent, knowledge, or authorization (the "Disclosure").

3. The Trackers Defendant embedded intercepted visitor's communications and interactions in real-time, and shared those communications with the Third Parties. As a result, the Third Parties harvested sensitive, private information including visitor's browsing activities, the pages they viewed and the buttons they clicked, their status as medical patients and/or as insured individuals, their medical histories, the drugs they take, their anticipated consumption of medical services, their locations, additional information from their health insurance

[1] The banner appears immediately upon a visitor's first visit to Defendant's website. A visitor to the website may choose to "Decline," Accept," or view "Cookie Preferences"; when a visitor chooses "Cookie Preferences," Defendant makes the above representation that visitors may choose the types of tracking/cookies they accept. The cookie banner is displayed prominently and persists until the visitor clicks "Accept" or "Decline."

applications, and identifying information including IP addresses and identifying cookies.

4. Worse still, the supposed "opt-out" offered via the cookie banner was functionally meaningless. Regardless of the visitor's selection, tracking occurred. This was not just a breach of trust. Defendant's actions violated both California and Federal law.

5. By knowingly deploying these tracking technologies in violation of its own express assurances and without meaningful user consent, Defendant violated the California Invasion of Privacy Act ("CIPA") and fundamental expectations of privacy in healthcare. Plaintiff brings this action to hold Defendant accountable for its unlawful wiretapping and its deceptive practices that left insurance customers and other visitors exposed – without warning, without choice, and without recourse.

6. A tracker (also referred to as "tracking technology") is a snippet of code embedded into a website that tracks information about its visitors and their website interactions.[2] When a person visits a website with a tracker, the tracker logs "events" (i.e., user interactions with the site), such as pages viewed, buttons clicked, and information submitted.[3] Then, the tracker transmits the event information back to the

---

[2] *See Meta Pixel*, Meta for Developers, https://developers.facebook.com/docs/meta-pixel/ (last visited Mar. 19, 2023).

[3] *See Conversion Tracking*, Meta for Developers, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited May 22, 2023).

website server and to Third Parties, where it can be combined with other data and used for marketing.[4]

7. Third Parties like TikTok, Meta, The Trade Desk and Google use the data they collect from the Trackers to build individualized profiles of the visitors who browse the AH website. The trackers from these Third Parties that Defendant installed on visitors' browsers include identifiers unique to each visitor. These unique identifiers are "cookies." On information and belief, the cookies remain installed on the visitor's browser even after the visitor navigates away from the AH website. Thus, because of AH's failure to honor the "Decline" button in its own cookie banner, TikTok, Meta, The Trade Desk, Google, and additional Third Parties intercept and store information about the pages visitors view, the information they enter, and the searches they perform, both on the AH website and elsewhere on the Internet.

8. On information and belief, the Third Parties profit from the information they collect by selling targeted advertising space to advertisers, where "targeted" means that The Third Parties know specific facts about the visitor based on their browsing behavior, including searches they performed on and information they provided to the AH website. Some of the relevant third parties, including at least the The Trade Desk, also share the visitor browsing data with other third-party data

[4] Id.

brokers via a process known as "cookie syncing."

9. AH harmed visitors by sharing sensitive and private healthcare information with undisclosed Third Parties even after AH explicitly promised *not* to do so. The Third-Party data brokers and advertisers then used each visitor's private health information to help build a personalized profile of that individual, for the purpose of selling interest-based targeted advertising. For example, when an individual informs Defendant that they are a tobacco user or a Viagra user while searching for health insurance on Defendant's website, AH shares this information and an identifier unique to that visitor with Third Parties including TikTok, The Trade Desk, and Google. Via cookie syncing, The Trade Desk in turn shares the same information with additional data brokers and advertising platforms. Thus, because of AH's unauthorized disclosure, the Third Parties know private details about the visitor's medical history and drug use, among other information. The visitor is more likely to see advertisements related to these their medical conditions and drug use as they browse the Internet.

10. AH sold out its customers' trust for a simple reason: money. Because Defendant conceals this information from visitors to its website and the public, Plaintiff does not know the precise mechanism by which AH profits from its sharing of visitors' browsing data, searches, IP addresses, unique cookie identifiers, and other information. On information and belief, AH profits by one or more of the

following mechanisms. First, AH receives payments from Third Parties in exchange for those Third Parties' placement of trackers and related cookies on the AH website. Second, AH receives a service or services from Third Parties either for free or at a discounted price. The service may be a technological tool embedded in the website, such as tools to improve functionality or to monitor website usage and performance. Third, AH receives the ability to purchase ad space on other websites at a reduced price or at a greater value for the same price. Plaintiff anticipates learning the precise mechanism(s) by which AH profits through discovery.

11. Health insurance patients do not anticipate that their trusted insurance provider will send their private health information to a hidden third party, especially when the insurance provider explicitly promises they will *not* install cookies if the visitor clicked "Decline." Here, the Third Parties with whom AH shares visitor information are especially poor stewards of that data. For example, The Trade Desk tracks visitors' identities and browsing data explicitly for the purpose of selling advertising space based on that visitor's interests and needs, as expressed through their browsing activity and search history. And TikTok, Meta, and Google have long and well-known histories of violating consumer privacy and trust for their own gain.

12. Defendant owed a variety of duties, including common law, statutory, contractual, and regulatory duties, to keep Plaintiff's and Class Members' communications safe, secure, and confidential.

13. Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' communications, Defendant assumed legal and equitable duties to those individuals to protect and safeguard their information from unauthorized disclosure.

14. Defendant breached its duties under California state law, including, for example, the California Invasion of Privacy Act ("CIPA"). That statue provides California consumers with rights to control their personal information including the right to know what personal information is being collected about them and whether that information is sold or disclosed and to whom, the right to prohibit the sale of their personal information, and the right to request deletion of their personal information. Cal. Civ. Code § 630 *et seq*. Defendant breached its obligations under this statute by, for example, failing to provide visitors with appropriate notice that their information was being disclosed to Third Parties for third- and fourth- party use. The notice and consent Defendant purports to provide and obtain, through the cookie banner it provides on its website, is not appropriate, as a reasonable Consumer would not have understood those as notifying them of Defendant's disclosure of their communications to Third Parties for third- and fourth- party use.

15. The Trackers Defendant installs on its website are "pen registers" under § 638.50(b) of CIPA because they record "routing, addressing, or signaling information" transmitted by the devices of Defendant's visitors. Cal. Penal Code §

638.50(b). The Trackers are also "trap and trace devices" under CIPA § 638.50(c) because they "capture the incoming electronic or other impulses that identify . . . dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication[.]" Cal. Penal Code § 638.50(c). These devices were activated even *after* visitors clicked "Decline," meaning the disclosures occurred without any valid consent and in direct contradiction of Defendant's public assurances.

16. Defendant repeatedly violated CIPA § 638.51(a) by installing and using the Trackers without a court order and without any valid consent from users. In fact, Defendant gave users a cookie banner that explicitly claimed they could "Decline" third-party cookies and tracking, then proceeded to install third-party cookies and trackers anyway. This false opt-out not only fails to meet CIPA's requirements but amplifies the harm: it encouraged users to share sensitive data under the false belief that it would remain private.

17. Defendant failed to provide Plaintiff and Class Members with a meaningful opportunity to opt out of the use of Trackers prior to disclosing their information. Second, even when users did opt out by clicking "Decline," Defendant continued to disclose their communications and identifying information to Third Parties. These dual failures underscore that Defendant's banner was a deceptive design element, not a genuine consent mechanism, and they render the disclosures

unlawful under CIPA.

18. Not only did Defendant fail to provide Plaintiff and Class Members with the opportunity to "opt-out," but it further failed to abide by their opt-out requests. Even after Plaintiff and Class Members chose the "Decline" option, Defendant continued to disclose their communications to Third Parties like TikTok, Meta, The Trade Desk, and Google.

19. Defendant's installation and use of the Trackers also violates the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq*, because it constitutes unlawful, unfair, and fraudulent business practices. Defendant not only disclosed visitor communications to Third Parties without proper authorization, but also presented visitors with a cookie banner that falsely suggested they could opt out of such disclosures. The banner was designed to give the appearance of compliance while functioning as a façade – visitors were tracked regardless of their choice. This bait-and-switch tactic is both unfair and deceptive, and it directly harmed Plaintiff and Class Members by luring them into using Defendant's website under false pretenses. This fraudulent conduct is especially egregious in context: Defendant is a health insurance company, entrusted with some of the most sensitive data a person can share. Health insurance customers and other visitors were led to believe that their visits to Defendant's website – often to explore coverage, find doctors, and learn about their health conditions – would remain

private. Instead, those visits were monetized. This betrayal of patient trust magnifies both the harm and the unfairness of Defendant's conduct.

20. Defendant further made express and implied promises to protect Plaintiff's and Class Members' communications and maintain the privacy and confidentiality of communications that visitors exchanged with Defendant. These promises included affirmative statements in the Defendant's cookie banner. The banner's representation – that users could "Decline" tracking and "choose which types of cookies to allow" – constituted an express promise to honor visitor choice. But Defendant broke that promise. Even when Plaintiff and Class Members opted out, Defendant continued to track and transmit their data to Third Parties. In doing so, Defendant violated its express and implied contracts and deprived Plaintiff of the privacy protections they were told they could expect.

21. Moreover, Defendant's cookie banner formed part of the overall agreement between Defendant and its visitors and website users. As the first and most visible interaction users had with the website, the banner constituted an explicit representation that users had control over the disclosure of their data. By failing to honor opt-out selections and continuing to track users despite those selections, Defendant breached its contractual duties, violated the implied covenant of good faith and fair dealing, and deprived Plaintiff of the benefit of their bargain.

22. Furthermore, by obtaining, collecting, using, and deriving a benefit

from Plaintiff and Class Members' communications, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard their information from unauthorized disclosure.

23. Defendant breached its common law, statutory, and contractual obligations to Plaintiff and Class Members by, *inter alia*, (i) failing to adequately review its web based technology to ensure the hospital website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web-users' information; (iii) aiding, agreeing, and conspiring with third parties to intercept communications sent and received by Plaintiff and Class Members; (iv) failing to obtain the written consent of Plaintiff and Class Members to disclose their communications to Third Parties for Third Party and fourth party[5] use, and ignoring Plaintiff and Class Members' preferences even when they explicitly declined consent; (v) failing to protect communications and take steps to block the transmission of Plaintiff's and Class Members' communications through the use of tracking technology; (vi) failing to warn Plaintiff and Class Members; and (vii) otherwise failing to design and monitor its website to maintain the confidentiality and integrity of visitor communications.

24. As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries-in-fact and damages, as detailed herein, including: (i)

[5] The term "fourth party" is defined and discussed below.

invasion of privacy; (ii) loss of benefit of the bargain; (iii) diminution of value of private information; (iv) statutory damages; and (v) continued and ongoing risks to their private information.

25. Plaintiff seeks to remedy these harms and brings causes of action for Negligence, Negligence Per Se, Violation of Comprehensive Computer Data Access and Fraud Act, Cal. Pen. Code § 502, Violation of Consumer Protection Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, Violation of Consumer Privacy Act, Cal. Civ. Code, §§ 1798.100, *et seq.*, Breach of Express and Implied Contract, Unjust Enrichment, Breach of Fiduciary Duty, Declaratory Judgment, Breach of Confidence, Violation of Invasion of Privacy Act, Cal. Pen. Code §§ 631, *et seq.*, Violation of Invasion of Privacy Act, Cal. Pen. Code §§ 632, *et seq.*, Violation of Invasion of Privacy Act, Cal. Pen. Code §§ 638, *et seq.*, Violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2511(1), *et seq.*, and Violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2511(3)(a), *et seq.*

## PARTIES

26. Plaintiff John Doe is a natural person and citizen of California, where he intends to remain. Plaintiff John Doe resides in Buena Park, California. Plaintiff Doe is one of Defendant's insured and a victim of Defendant's unauthorized Disclosure of his communications.

27. Defendant AH is a health insurance provider that does business throughout the United States, including in California. Defendant has its headquarters in St. Louis, Missouri. Defendant transacts or has transacted business in this District and throughout the United States.

**JURISDICTION AND VENUE**

28. This Court has personal jurisdiction over Defendant because, personally or through its agents, Defendant operates, conducts, engages in, or carries on a business in this State, maintains corporate offices in California, and committed tortious acts in this State.

29. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Complete diversity exists between Defendant and at least one member of the proposed Classes, and there are more than one hundred (100) members in the proposed Classes.

30. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because it arises under the laws of the United States. The Court has supplemental jurisdiction over Plaintiff's claims arising under state law pursuant to 28 U.S.C. § 1367.

31. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this district

and continue to occur in this district.

## COMMON FACTUAL ALLEGATIONS

### A. Defendant's Website Collects Sensitive, Private Information from Visitors.

32. Defendant offers health insurance plans. Defendant's offerings include plans marketed directly to consumers. "Since 2014, Ambetter Health has been offering health insurance plans across the U.S., including many options on the Health Insurance Marketplace."[6]

33. Defendant encourages prospective and existing customers to use its website, https://www.ambetterhealth.com/. Defendant's website provides various services, including the ability to explore health insurance coverage options,[7] view programs and savings,[8] visit a member center,[9] view educational resources,[10] and more.

34. Defendant's website includes pages on which visitors are encouraged to enter information about their identities, locations, medical histories, medications,

---

[6] *Ambetter Health Insurance: About Us | Ambetter Health*, https://www.ambetterhealth.com/en/about-us/ (last visited Jul. 5, 2025).

[7] Marketplace Insurance https://www.ambetterhealth.com/en/health-plans/ (last visited Jul. 6, 2025).

[8] *Programs and Savings*, https://www.ambetterhealth.com/en/programs-savings/ (last visited Jul. 6, 2025).

[9] *Log In Ambetter*, https://member.ambetterhealth.com/ (last visited Jul. 6, 2025).

[10] *Knowledge Center,* https://www.ambetterhealth.com/en/knowledge-center/ (last visited Jul. 6, 2025).

conditions, and expected consumption of medical services. For example, a link entitled "Shop Plans" is displayed prominently in the upper left-hand corner of the website's landing page.[11] Visitors who click this link are presented with a series of queries (the "enrollment flow") designed to match them with an appropriate insurance plan, along with an estimated monthly premium payment. Defendant's enrollment flow includes a page entitled "Do you take any prescription drugs?," which asks the visitor to enter the name of the drug, the visitor's dosage, and the visitor's gender and age.[12] The same flow includes pages that collect the visitor's zip code and email address. *Id.* It also includes a page that requests the reason the visitor is seeking insurance coverage (potential answers include "lost_coverage"). *Id.* It also includes a page that requests the amount of healthcare services the visitor expects to consume. *Id.* The visitor is prompted to estimate the total number of doctor visits and prescription drugs they expect to use, among other information). *Id.* The visitor is also prompted to specify whether they are a smoker. *Id.*

35. For another example, a link entitled "Find a Doctor" is also displayed prominently in the upper-right-hand corner of the Defendant's landing page. [13]

---

[11] *Ambetter Health | Affordable Health Insurance Plans*, www.ambetterhealth.com/en/ (last visited August 8, 2025).

[12] *Ambetter Health | Health Insurance Marketplace Plan*, enroll.ambetterhealth.com/marketplace/ (last visited August 8, 2025).

[13] *Ambetter Health | Affordable Health Insurance Plans*, www.ambetterhealth.com/en/ (last visited August 8, 2025).

Visitors who click this link are prompted to share their exact location (via the "Use my current location" link) and/or their "City, county or ZIP code."[14] After entering their location, visitors are prompted to specify what type of doctor they are searching for. *Id.* For example, the visitor may specify that they are searching for a doctor who specializes in "Medical Oncology."

36. For another example, a link entitled "For Members" is also displayed prominently on the Defendant's landing, directly to the right of the "Shop Plans" link. [15] Visitors who are existing customers may use this portion of the site to pay their premiums (*see* "Pay Now" *link*), view outstanding claims, and review plan benefits, among other services. *See id.*

37. Thus, Defendant's website encourages visitors to enter sensitive and private information about their identities, locations, medical histories, medications, conditions, and expected consumption of medical services.

38. Unbeknownst to visitors, when visitors enter the requested information on Defendant's website, Defendant immediately shares that sensitive and private information with third parties, including the social media companies TikTok and Facebook, and the marketing/data brokerage companies Google, The Trade Desk,

[14] *Find a Provider: Set Location*, findaprovider.ambetterhealth.com/location (last visited August 8, 2025).

[15] *Ambetter Health | Affordable Health Insurance Plans*, www.ambetterhealth.com/en/ (last visited August 8, 2025).

and Xandr (a Microsoft subsidiary). The sharing occurs because Defendant's website includes trackers and cookies that intercept visitors' communications with Defendant and share the contents of those communications with multiple third parties. What's worse, Defendant shares this sensitive and private information *even if visitors explicitly direct Defendant not to do so* via Defendant's illusory opt-out cookie banner.

39. Before describing Defendant's cookie banner and the specific trackers and cookies that persist on its website even after visitors attempt to opt out, it is useful to discuss how trackers and cookies work in general.

**B. How "Cookies" and "Trackers" Surreptitiously Share Users' Communications and Unique Identifiers With Third Parties.**

40. Visiting a website involves a series of electronic communications between the visitor's browser and the website's servers. When a person visits a website like www.ambetter.com, their browser initiates a series of web requests to Defendant's servers, requesting the webpage and associated resources. These are typically styled as HTTP "GET" requests. As the visitor's browser processes the webpage, additional requests may be triggered by scripts embedded within the webpage. These scripts are instructions sent by the webpage to the visitor's browser, which the visitor's browser then executes.

41. A visitor's interactions with a website may also involve HTTP "POST" requests. In a typical POST request, the visitor's browser sends information to the

website's server. For example, when a visitor to www.ambetter.com fills in the forms prompting them to describe their medical histories, medications, conditions, and expected consumption of medical services (*see* Part A *above*), their browser sends a POST request to Defendant's web server containing the information they entered into the forms.

42. "Trackers" are one type of script that may be embedded within a webpage delivered in response to a "GET" request. Trackers instruct a visitor's browser to send information about the visitor's browsing activity to the tracker's developer. Tracked browsing information may include words typed, links clicked, time spent on each page, and buttons clicked by the visitor. This browsing information is typically accompanied by one or more data points that uniquely identify the visitor, such as their IP address, or a "cookie."

43. "Cookies" are small text files sent by a website server to a visitor's browser and stored locally on the visitor's device. Typically, cookies contain a unique identifier tied to a specific visitor. When a visitor's browser sends an HTTP request to a website server, the request includes the cookie or cookies that allow the server to identify the visitor.

44. First-party trackers and cookies are those developed and set by the web server with which the visitor is knowingly communicating. Here, first-party trackers and cookies are those developed by Defendant and set by Defendant's website,

www.ambetter.com.

45. Third-party trackers and cookies are those developed and set by a third-party company or domain. Common third-party trackers and cookies include those developed and set by Google, The Trade Desk, TikTok, Xandr, and Meta/Facebook, all of which are embedded in Defendant's website. When a visitor's browser loads a webpage containing an embedded third-party tracker, the tracker – which is simply a script, *i.e.*, lines of code – instructs the visitor's browser to determine whether that third-party's cookie is already stored on the visitor's device. If not, the tracker instructs the browser to store a new cookie uniquely associated with that visitor. If so, the tracker instructs the browser to send the stored cookie to the third-party's server, typically along with additional information about the visitor's browsing activity. Because third-party cookies persist across multiple sessions and webpages, third-party cookies allow their developers to track specific individual's browsing across websites and sessions.

46. Third-party trackers and cookies like those present on Defendant's website are generally invisible to the visitor, unless the visitor uses custom software designed to reveal trackers and cookies.

47. When a visitor accesses a webpage containing third-party trackers and cookies, the trackers instantaneously intercept and duplicate communications sent between the visitor's browser and the website's server. Duplicated communications

include the HTTP "GET" requests through which the visitor's browser requests the webpage and related resources, as well as the HTTP "POST requests, which typically deliver information the visitor entered on the site, such as a search query, email address, or radial or drop-down selections on a form. through which the visitor's browser typically provides visitor.

48. Thus, while it appears to the visitor that their browser is communicating only with the owner of a specific website, in fact their communications are intercepted and shared in real-time with undisclosed third parties.

49. Here, while visitors to www.ambetter.com believe they are communicating only with Defendant, in fact their communications and intercepted and shared in real-time with various third parties – including TikTok, Google, The Trade Desk, Xandr (Microsoft), and Meta/Facebook – via the third-party trackers Defendant embedded in its website.

50. Third-party trackers and cookies represent an invasion of privacy. When third-party trackers and cookies are present on consumer-facing websites, information that consumers expect to remain private between themselves and the website's owner is surreptitiously intercepted and shared with undisclosed third parties.

51. Accordingly, many websites allow visitors to affirmatively opt-out of third-party trackers and cookies. These opt-out tools are especially relevant where,

as here, the website collects information that is particularly sensitive and private, such as the visitor's location, medical history, medications, conditions, and expected consumption of medical services. The ability to opt-out of third-party tracking gives visitors comfort they may safely share private and sensitive information with a specific company – here, their health insurance provider – without fear that the information will be shared more widely. Were it not for the ability to opt-out of third-party tracking, many visitors would not be comfortable entering their medical information on the Internet.

52. Defendant purports to offer a tool by which website visitors may opt-out of third-party trackers and cookies, in the form of a "cookie banner" that appears when the visitor first loads the webpage and persists until the user clicks "Decline" or "Accept."

53. Unfortunately for Plaintiff and members of the putative Class, Defendant's purported opt-out mechanism is illusory. As described below, Defendant embeds third-party trackers and cookies even if the visitor clicks "Decline" on Defendant's cookie banner. Thus, Defendant shares visitors' sensitive and private health information with third parties, even after explicitly promising it will not do so.

### C. Defendant Falsely Promises that Website Visitors May Opt-Out of Third-Party Cookies and Tracking.

54. When a visitor arrives on Defendant's website, Defendant displays a

"cookie banner," which purports to allow the visitor to opt-out of third-party cookies and tracking.

55. The cookie banner is designed to give visitors comfort that the sensitive, private information they enter into Defendant's website will not be shared with third parties.

56. The banner appears as a pop-up overlay displayed on all pages of the website. The banner persists on every page unless and until the user interacts with it. As shown below, the banner states that "This website uses cookies," and provides three options the visitor must choose between: "Decline" the use of cookies; "Accept" the use of cookies; or "Cookie Preferences."



57. When a user clicked on "Cookie Preferences," a pop-up appears, shown below. The pop-up categorizes the cookies on Defendant's website into four categories: "Essential," "Advertising," "Analytics & Customization," and "Performance and Functionality." "Essential" cookies are marked as "Always active." Accordingly, visitors may not opt-out of these cookies. Defendant



categorizes cookies form the following entities as "Essential" cookies: Qualtrics, Adobe, Securiti.ai, Microsoft, and Cloudflare.

58. In contrast to "Essential" cookies, Defendant represents that visitors "may choose which types of cookies to allow" with respect to the other three categories. Thus, Defendant promises via its cookie banner that visitors may opt-out of all "Advertising," "Analytics & Customization," and "Performance & Functionality" cookies, either by clicking the "Decline" option on the cookie banner, or by de-selecting specific categories in the "Cookie Preferences" pop-up.

59. The second category is "Advertising" cookies, which Defendant says "help serve advertising content that is relevant to you." Defendant categorizes cookies from the following entities as "Advertising" cookies: Meta, Google, Bing, Adobe, Stackadapt, Xandr, The Trade Desk, Bidswitch, Magnite, Index Exchange, Podscribe, Pubmatic, Demandbase, and Undertone.

60. The third category is "Analytics & Customization" cookies. Defendant categorizes cookies from the following entities as "Analytics & Customization" cookies: Adobe, Hubspot, Clarity, Google, and Invoca.

61. The fourth and final category is "Performance & Functionality." Defendant categorizes cookies from the following entities as "Performance &

Functionality": Adobe, Hubspot, CrazyEgg, Dynatrace, Akamai, Google, and YouTube.

62. Defendant's cookie banner and associated "Cookie Preferences" pop-up create the illusion that Defendant is a responsible steward of their sensitive private information, and that visitors have control over whether the information they share with Defendant will in turn be shared with third parties. In fact, Defendant ignores visitors' preferences. The cookie banner is meaningless. Defendant installs third-party trackers and cookies regardless of whether visitors opt-out.

63. Even after visitors click "Decline" on the cookie banner, Defendant installs at least the following third-party trackers and cookies on the visitors' browsers as they navigate Defendant's website. All cookies listed here are in categories Defendant itself defines as non-"Essential" cookies that Defendant falsely represents will *not* be installed if visitors click "Decline" or opt-out of specific categories in the "Cookie Preference" pop-up:

a. Meta's "c-user" cookie, which Meta uses to identify individual visitors.

b. Google's "NID" and "IDE" cookies, both of which Google uses to build individualized profiles of visitors' interests for the purpose of selling targeted advertising.

c. The Trade Desk's "TDCPM" and "TDID" cookies, which The Trade Desk uses for the same purpose (targeted advertising).

d. Xandr's "anj", "icu," "uids," "usersync," "uuid2," and "XANDR_PANID" cookies. Xandr is a subsidiary of Microsoft focused on digital advertising. On information and belief, Xandr uses these cookies for the same purpose (targeted advertising).

e. StackAdapt's "sa_user_id," "sa_user_id-v2," "sa_user_id-v3," and "sa_user_id-v4" cookies. On information and belief, StackAdapt uses these cookies for the same purpose (targeted advertising).

f. Undertone's "UTID" and "UTID_ENC" cookies, among many others. On information and belief, Undertone uses these cookies for the same purpose (targeted advertising).

g. HubSpot's "_cf_bm" and "_ctuvid" cookies.

h. Microsoft's "Anon", "MR," "MSPTC," "MUID," and "NAP" cookies.

64. In addition, Defendant automatically installs third-party trackers and cookies from the following entities that are *not disclosed at all* in the "Cookie Preferences" pop-up or cookie banner. With respect to these entities, Defendant does not even notify the visitor that their trackers and cookies even *exist* on the website, even as Defendant falsely purports to let visitors opt-out of third-party trackers and cookies:

a. TikTok. TikTok is a social media platform owned and operated by the Chinese Internet company ByteDance.

b. Mixpanel. Mixpanel is a digital analytics platform that tracks user interactions with web and mobile applications.

65. Thus, the representations Defendant makes in its cookie banner are false. Even after visitors "Decline" third-party trackers and cookies, Defendant betrays their trust and installs third-party trackers and cookies on their browsers anyway. The third-party trackers and cookies it installs include "Advertising" and other non-"Essential" cookies belonging to entities whose cookies Defendant explicitly promised would *not* be installed if the visitor opted out.

66. As a result, Defendant intercepts visitors' communications with www.ambetterhealth.com and discloses those communications to multiple third parties, even after visitors expressly direct Defendant not to do so. This betrayal of trust is particularly disturbing in light of the sensitive and private nature of the health-related information visitors generate on Defendant's website, which Defendant immediately shares with third party advertising companies like Google, Meta, and The Trade Desk, thereby violating visitors' privacy and betraying Defendant's explicit representations to visitors in its cookie banner.

**D. The Information Defendant Intercepted and Disclosed is Deeply Sensitive and Private.**

67. The information Defendant's Trackers sent to Third Parties like TikTok, Meta, The Trade Desk, and Google includes private and confidential information that Plaintiff and Class Members submitted to Defendant's website, including: the

pages they viewed and the buttons they clicked; information from their health insurance applications; progress as they shop for health insurance policies; health concerns; status as insured individuals; and identifying information including IP addresses and identifying cookies (the "Disclosed Information").

68. ***For example***, visitors interested in shopping for health insurance policies can use Defendant's website to shop for personalized plans. Defendant's website leads them through an application process. Defendant discloses the information that visitors provide during this process to Third Parties, even if visitors decline tracking. Defendant shares visitors' responses in real-time with at least the following Third Parties: TikTok, Xandr (Microsoft), Google, The Trade Desk, Adobe, and Mixpanel.

69. The information collected and disclosed to Third Parties via this process includes at least the following information about the visitor's:

- Tobacco usage, *i.e.*, disclosing whether the visitor is a smoker;
- Level of expected healthcare use, *i.e.*, disclosing whether the visitor expects their level of healthcare use to be "utilization=high" or "utilization=medium";
- Searches for their preferred physicians, *e.g.*, disclosing that they conducted a search for Dr. "Amy Jones"; and
- Preferred prescription drugs, *e.g.*, disclosing that the visitor conducted

a keyword search for "query=Viagra" and/or that the visitor selected they have a prescription supply for a "duration . . . [of] 12" months.

70. Disclosed Information also includes identifying information the visitor is prompted to provide, including:

- Location details, *i.e.*., disclosing the zip code where the visitor resides;
- Gender information, *i.e.*, disclosing the visitor's gender;
- Household size, *i.e.*, disclosing that the user is applying for health insurance policy for a "household_size" of a given numeric size; and
- Age, *e.g.*, disclosing that the user is aged 70.

71. Defendant also discloses information related to the visitor's health insurance status, *e.g.*, disclosing that the user's reason for application is due to "lost_coverage."

72. When the visitor ultimately decides to enroll in a health insurance plan, Defendant informs Third Parties of this fact, including at least TikTok.

73. ***As a second example***, visitors can use Defendant's provider directory to search for medical professionals. When visitors conduct this type of search, Defendant shares users' search details with Third Parties, revealing visitors' health concerns. Defendant shares this information even if the visitor declines third-party tracking and cookies.

74. When the visitor navigates to the provider directory page, Defendant

informs at least Google and Qualtrics that the user is on the page, "findaprovider.ambetterhealth.com." Defendant further informs Google that the user is on a page entitled "Find a HealthCare Provider."

75. From the Find a HealthCare Provider page, visitors can filter medical providers based on practice specialties. Defendant shares the filters that visitors select with Third Parties.

76. For example, a cancer patient can search for providers who specialize in oncology. When the patient does so, Defendant informs Google that the patient conducted a search to "Find a Provider" with the "specialty [] type" of "Medical Oncology."

77. **As a third example**, Defendant shares customer's login and bill payment activity with Third Parties, thus disclosing their status as insured individuals. Defendant shares this information even if the customer declines third-party tracking and cookies.

78. Customers of Defendant can visit Defendant's website to manage their insurance. Activities customers may perform include logging in, creating a new login, and paying their bill. As the customer performs any of these activities, Defendant transmits these events to Third Parties including, at least HubSpot, Amplitude, and Dynatrace.

79. In all cases include the three examples discussed above, the Disclosed

Information includes both a cookie unique to the individual's browser and an IP address. Both of these data points separately enable unique identification of a specific individual.

80. The Disclosed Information allows Third Parties to establish that a particular individual is seeking medical care, uses specific prescription drugs, suffers from a specific condition, lives in a specific geographic location, and is either insured or uninsured. Defendant's unauthorized disclosure engenders a variety of harmful consequences, including social stigma, higher insurance rates, familial stress, and loss of trust in healthcare providers leading to under-diagnosis and treatment.

81. The Disclosed Information includes both Protected Health Information

("PHI")[16] and Personally Identifying Information ("PII")[17] linking the Disclosed Information to a specific visitor. The Disclosed Information includes browser-specific cookie IDs unique to each visitor ("Unique ID Cookies"), as well as the IP address unique to each visitor.

**E. Defendant Profits from its Non-Consensual Disclosure of Visitors' Private Health Information, as do the Third Parties to Whom Defendant Discloses that Information.**

82. On information and belief, the Third Parties with whom Defendant shares visitors' private health information derive profit from the Disclosed Information through one or more of the following mechanisms: (1) building individualized profiles about visitors' interests and selling targeted advertising; (2)

---

[16] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws- regulations/index.html (last accessed Apr. 16, 2020). Genesis Health is clearly a "covered entity" and some of the data compromised in the Disclosure that this action arises out of is "protected health information," subject to HIPAA.

[17] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person." 17 C.F.R. § 248.201(b)(8).

selling the Disclosed Information, possibly aggregated with additional information gleaned from other sources, to other third parties; and (3) providing analytics and other services in exchange for a subscription fee or other payment.

83. Data harvesting is big business. As one court recently held, "[the Defendant] cannot seriously dispute that browsing history and data mined from individuals using the internet has significant economic value. If it did not have value, then entire industries that sell and trade this data would not exist. As [the plaintiff's expert] explained, there is an entire 'data industry' and estimates suggests that that industry 'now generates combined annual revenues of approximately $300 billion dollars.'" *John Doe et al v. Virginia Mason Medical Center*, No. 19-2-26674-1 SEA, 2024 WL 3517759 (Wash. Sup. Ct., June 6, 2024).

84. Health data is particularly valuable. The collection and sale of consumer health data is both uniquely lucrative, and represents unique risks to consumer privacy.[18] As CNBC reported in 2019, "patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[19]

---

[18] *See* Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, Time, (Jan. 9, 2017 at 9:00 a.m.) https://time.com/4588104/medical-data-industry/.

[19] *See* Christina Farr, *Hospital Execs Say They are Getting Flooded with Requests for Your Health Data*, CNBC, (Dec. 18, 2019 at 8:27 a.m.) https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

85. On information and belief, Defendant profits from its sharing of Disclosed Information by one or more of the following mechanisms. First, AH receives payments from Third Parties in exchange for those Third Parties' placement of trackers and related cookies on the AH website. Second, AH receives a service or services from Third Parties either for free or at a discounted price. The service may be a technological tool embedded in the website, such as tools to improve functionality or to monitor website usage and performance. Third, AH receives the ability to purchase ad space on other websites at a reduced price or at a greater value for the same price. Plaintiff anticipates learning the precise mechanism(s) by which AH profits through discovery.

### F. Defendant's Actions Violate Many Relevant Standards of Conduct

#### *i. Defendant Violated HIPPA Standards*

86. Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences, including discrimination in the workplace and denial of insurance coverage. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment, which can lead to more serious health problems down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical provider is necessary to maintain

public trust in the healthcare system as a whole.

87. Recognizing these facts, and in order to implement requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), HHS has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect private information like that Plaintiff and Class Members communicated on Defendant's website.

88. Under HIPAA, a healthcare provider may not disclose personally identifiable, non-public medical information (PHI) about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[20]

89. Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

90. In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

91. Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For

[20] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data. If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[21]

92. In its guidance for Marketing, the Department further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or him protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list. (Emphasis added).[22]

93. In addition, in December 2022, the Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS) issued a Bulletin to highlight the obligations of HIPAA-covered entities and business associates ("regulated

---

[21] Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, U.S. Department of Health and Human Services (Nov. 26, 2012) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

[22] *Marketing*, U.S. Department of Health and Human Services, (Dec. 3, 2002) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technology.[23] (the "December 2022 Bulletin").[24]

94. Therein, HHS defined tracking technologies, explaining:

> Tracking technologies are used to collect and analyze information about how users interact with regulated entities' website or mobile applications ("apps"). For example, a regulated entity may engage a technology vendor to perform such analysis as part of the regulated entity's health care operations. The HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information (PHI). Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors.[25]

95. In the Bulletin, HHS was clear in unambiguous terms that, "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking

---

[23] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Department of Health and Human Services, https://www.hhs.gov/hipaa/forprofessionals/privacy/guidance/hipaa-online-tracking/index.html.

[24] See archived version of the December 2022 Bulletin at HHS Office for Civil Rights Issues Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information, HHS.gov (Dec. 1, 2022), https://web.archive.org/web/20221201192812/https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Mar. 30, 2024).

[25] *Id.*

technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[26,27]

96. On March 18, 2024, HHS updated its December 2022 bulletin, "to increase clarity for regulated entities and the public" and reiterating the above basic privacy obligations.[28,29]

97. Citing The Markup's June 2022 article, the Bulletin expressly notes:

> Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors. **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules**. For example, disclosures of PHI to tracking technology vendors or marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.

98. An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the

---

[26] *Id*. (bold emphasis in original)

[27] Citing *to* 45 CFR 164.508(a)(3); *see also* 45 CFR 164.501 (definition of "Marketing").

[28] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Dept. of Health and Human Svcs. Office for Civil Rights, (Dec. 1, 2022, updated Mar. 18, 2024), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited June 20, 2024).

[29] On June 20, 2024, in *American Hospital Association, et al. v. Xavier Becerra, et al.,* Case No. 4:23-cv-01110-P (N.D. Tx., Jun. 20, 2024, Doc. 67), the U.S. District Court for the Northern District of Texas vacated HHS's March 14, 2024 Bulletin as to the "Proscribed Combination," *but* acknowledged that the Proscribed Combination could be PHI in certain circumstances.

individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule. [30]

99. In other words, HHS has expressly stated that Defendant's conduct of implementing tracking technologies is a violation of HIPAA Rules.

*ii. Defendant Violated FTC and HHS Standards*

100. The Federal Trade Commission ("FTC") has also recognized that implementation of tracking technologies pose "serious privacy and security risks" and "impermissibly disclos[e] consumers' sensitive personal health information to

[30] *Id.* (emphasis in original) (internal citations omitted).

third parties."[31]

101. The OCR and the FTC warn about the "serious privacy and security risks related to the use of online tracking technologies" present on websites such as Defendant's, that "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[32] OCR and FTC agree that such tracking technologies, like those present on Defendant's website, "can track a user's online activities" and "gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users."[33] OCR and FTC warn that

> Impermissible disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual or others. Such disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more. In addition, impermissible disclosures of personal health information may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others.[34]

---

[31] *Re: Use of Online Tracking Technologies*, U.S. Dep't of Health & Human Services, (July 20, 2023) (available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf).

[32] *Re: Use of Online Tracking Technologies*, U.S. Dep't of Health & Human Services (July 20, 2023), available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf (last visited April 9, 2024).

[33] Id.

[34] *Id.*

102. On July 20, 2023, the FTC and HHS sent a "joint letter to approximately 130 hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as Meta/Facebook pixel and Google Analytics, that can track a user's online activities."[35]

103. Therein, the FTC reminded healthcare providers that "HIPAA regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other violations of the HIPAA Rules"[36] and that "[t]his is true even if you relied upon a third party to develop your website or mobile app and even if you do not use the information obtained through use of a tracking technology for any marketing purposes."[37]

104. Entities that are not covered by HIPAA also face accountability for disclosing consumers' sensitive health information under the Health Breach Notification Rule. 16 C.F.R. § 318. This Rule requires that companies dealing with health records notify the FTC and consumers if there has been a breach of unsecured identifiable health information, or else face civil penalties for violations. *Id.* According to the FTC, "a 'breach' is not limited to cybersecurity intrusions or

---

[35] *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, Federal Trade Commission (July 20, 2023) https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking?utm_source=govdelivery.

[36] Id.

[37] Id.

nefarious behavior. Incidents of unauthorized access, *including sharing of covered information without an individual's authorization*, triggers notification obligations under the Rule."[38]

105. Additionally, the FTC Act makes it unlawful to employ "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" 15 U.S.C. § 45(a). According to the FTC, "the disclosure of [sensitive health] information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule."[39]

106. As such, the FTC and HHS have expressly stated that conduct like Defendant's runs afoul of the FTC Act and/or the FTC's Health Breach Notification Rule.

107. On March 18, 2024, HHS updated its December 2022 bulletin in the "March 2024 Bulletin," expanding the circumstances in which HHS would consider information from any unauthenticated website visitor to be considered PHI, and its

---

[38] *Statement of the Commission: On Breaches by Health Apps and Other Connected Devices,* U.S. Fed. Trade Commission, (Sept. 15, 2021) (available at https://www.ftc.gov/system/files/documents/public_statements/1596364/statement_of_the_commission_on_breaches_by_health_apps_and_other_connected_devices.pdf) (emphasis added).

[39] *See, e.g., U.S. v. Easy Healthcare Corp*., Case No. 1:23-cv-3107 (N.D. Ill. 2023); *In the Matter of BetterHelp, Inc.,* FTC Dkt. No. C-4796 (July 14, 2023); *U.S. v. GoodRx Holdings, Inc.,* Case No. 23-cv-460 (N.D. Cal. 2023); *In the Matter of Flo Health Inc.,* FTC Dkt. No. C-4747 (June 22, 2021).

disclosure to be a violation of HIPAA.[40,41]

108. The March 2024 Bulletin added guidance on when the disclosure of individually identifiable health information ("IIHI") is impermissible under HIPAA, explaining that: "the mere fact that an online tracking technology connects the IP address of a user's device (or other identifying information) with a visit to a webpage addressing specific health conditions or listing health care providers is not a sufficient combination of information to constitute IIHI ***if the visit to the webpage is not related to an individual's past, present, or future health, health care, or payment for health care***."[42]

109. However, in contrast, when a user visits a website related to his or her past, present, or future health, health care, or payment for health care, such as "…looking at a hospital's webpage listing its oncology services to seek a second opinion on treatment options for their brain tumor, the collection and transmission of the individual's IP address, geographic location, or other identifying information

---

[40] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Dept. of Health and Human Svcs. Office for Civil Rights, (Dec. 1, 2022, updated Mar. 18, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited June 21, 2024).

[41] On June 20, 2024, in *American Hospital Association, et al. v. Xavier Becerra, et al.,* Case No. 4:23-cv-01110-P (N.D. Tx., Jun. 20, 2024, Doc. 67), the U.S. District Court for the Northern District of Texas vacated HHS's March 14, 2024 Bulletin as to the "Proscribed Combination," *but* acknowledged that the Proscribed Combination could be PHI in certain circumstances.

[42] *Id.* (bold, italicized emphasis added).

showing their visit to that webpage is a disclosure of PHI to the extent that the information is both identifiable and related to the individual's health or future health care[,]" such that the disclosure of their information would be PHI, HIPAA rules apply, and that disclosure would be a violation of HIPAA.[43]

*iii. Defendant Violated Industry Standards*

110. A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

111. The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications, which are applicable to Defendant and its physicians.

112. AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care . . . . Patient privacy encompasses a number of aspects, including . . . personal data (informational privacy).

113. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who

[43] Id.

> propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

114. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically . . . must . . . release patient information only in keeping ethics guidelines for confidentiality.

115.

## PLAINTIFF-SPECIFIC FACTUAL ALLEGATIONS

116. Plaintiff John Doe has visited Defendant's website to look at plans.

117. On information and belief, Plaintiff John Doe was presented with the cookie banner on Defendant's website, and consistent with his normal practice of routinely declining cookies when offered the choice, he clicked the "Decline" option.

118. Plaintiff is a Facebook user. After Plaintiff used Defendant's website, targeted advertisements began appearing on his Facebook page related to the information he input on Defendant's website.

119. Plaintiff John Doe reasonably expected that his online communications with Defendant were confidential, solely between himself and Defendant, and that, as such, those communications would not be transmitted to or intercepted by a Third Party.

120. Plaintiff provided information to Defendant and trusted that the information would be safeguarded according to industry standards, the representations in Defendant's cookie banner, and the law.

121. Plaintiff never intended to sell his communications or Disclosed Information, nor would he have permitted it to be made available for sale on the resale market.

122. On information and belief, through their use of The Trade Desk trackers, Google trackers, and other trackers, Defendant disclosed to Third Parties like The Trade Desk and Google:

a. The pages and content Plaintiff viewed;

b. Plaintiff's seeking of insurance;

c. Plaintiff's insured status;

d. Plaintiff's search terms; and,

e. Plaintiff's identifying information, including IP addresses and "c_user" cookies.

123. Plaintiff accessed Defendant's website at Defendant's direction and encouragement.

124. Plaintiff and the Class Members visited Defendant's website in relation to their past, present, and future insurance for health care. When Plaintiff and Class Members used Defendant's website, they thought they were communicating

exclusively with their trusted insurance provider.

125. Plaintiff relied on Defendant's website to communicate and did so with the understanding that Defendant would not share his communications or Disclosed Information.

126. At no point did website visitors like Plaintiff sign any written authorization permitting Defendant to send his communications or Disclosed Information to Third Parties (or fourth parties) uninvolved in providing him with healthcare or health insurance.

127. Plaintiff reasonably expected that his communications with Defendant were confidential, solely between each Plaintiff and Defendant, and that, as such, those communications and any information submitted would not be transmitted to or intercepted by third parties (or used by a fourth party).

128. Plaintiff provided his information to Defendant and trusted that the information would be safeguarded according to Defendant's promises and the law.

129. Had he been aware of Defendant's sharing practices, Plaintiff would not have authorized Defendant to make his communications and Disclosed Information available for sale on the resale market.

130. Plaintiff never intended to let Defendant benefit from his communications and Disclosed Information.

131. Through the systematic data sharing process described in this

complaint, Plaintiff's interactions with Defendant's website were disclosed to Third Parties, including The Trade Desk and Google. Plaintiff did not consent to those disclosures.

132. By failing to receive the requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiff's communications and Disclosed Information.

133. Plaintiff would not have submitted his information to Defendant if he had known it would be shared with Third Parties and fourth.

134. As a result of Defendant's Disclosure of Plaintiff's communications and Disclosed Information to Third Parties (and fourth parties) without authorization, Plaintiff was harmed in the following ways:

a. Loss of privacy;
b. Unauthorized disclosure of his communications and Disclosed Information;
c. Unauthorized access to his communications and Disclosed Information by Third Parties;
d. Defendant benefited from the use of Plaintiff's communications and Disclosed Information without sharing that benefit with Plaintiff;
e. Lost benefit of his bargain with Defendant, as Plaintiff did not receive the reasonable privacy and data security protections for which he paid;

f. Defendant enriched itself at Plaintiff's expense without sharing the revenue, profit, and/or cost-savings attributable to collecting Plaintiff's communications and Disclosed Information without authorization and sharing it with Third Parties (and fourth parties);

g. Defendant profited from collecting and disclosing Plaintiff's communications and Disclosed Information without authorization through one or more mechanisms, as-yet unknown to Plaintiff, which may include: (1) direct payments from Third Parties, including The Trade Desk and Google, (2) free or reduced cost for services, including services related to the implementation and monitoring of the AH website, and/or (3) the ability to purchase ad space on other websites at a reduced price or at a greater value for the same price;

h. Plaintiff lost his ability to keep his communications and Disclosed Information private;

i. Embarrassment, humiliation, frustration, and emotional distress;

j. Decreased value of Plaintiff's communications and Disclosed Information;

k. Increased risk of future harm resulting from future use and disclosure of their communications and Disclosed Information; and

l. Statutory damages.

## TOLLING, CONCEALMENT, AND ESTOPPEL

135. The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

136. Defendant seamlessly incorporated the Trackers into its website while providing visitors using those platforms with no indication that their website usage was being tracked and transmitted to Third Parties. Defendant knew that its website incorporated the Trackers, yet it failed to disclose to Plaintiff and Class Members that their sensitive communications and Disclosed Information would be intercepted, collected, used by, and disclosed to Third Parties.

137. Even while exercising due diligence, Plaintiff and Class Members could not have discovered the full scope of Defendant's conduct, because there were no disclosures or other indications that they were interacting with a website employing tracking technology to unauthorizedly disclose their communications and Disclosed Information to unaffiliated Third Parties or that their information would subsequently be sold to fourth parties for the purpose of marketing Third and fourth party products.

138. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendant's illegal interception and disclosure of Plaintiff's and the Class's communications and Disclosed Information has continued unabated. What is more, Defendant was under

a duty to disclose the nature and significance of its data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

139. Plaintiff brings this nationwide class action on behalf of himself and on behalf of all other similarly situated persons pursuant to Fed. R. Civ. P. 23.

140. Plaintiff seeks to represent the following classes:

> **Nationwide Class**: All individuals in the United States within the applicable statute of limitations who clicked "Decline" on Defendant's cookie banner and whose information was disclosed by Defendant to Third Parties through Defendant's website's tracking technology without authorization.

> **California Subclass**: All citizens of California within the applicable statute of limitations who clicked "Decline" on Defendant's cookie banner and whose information was disclosed by Defendant to Third Parties through Defendant's website's tracking technology without authorization.

141. Excluded from the Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

142. Plaintiff reserve the right to modify or amend the definition of the

proposed classes before the Court determines whether certification is appropriate.

143. This action satisfies the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23(a)(1)-(4).

144. <u>Numerosity</u>: Class Members are so numerous and geographically dispersed that joinder of all members is impracticable. Upon information and belief, there likely millions of individuals throughout the United States whose communications were improperly used or disclosed by Defendant, and the Classes are identifiable within Defendant's records.

145. <u>Ascertainability</u>. Class Members are readily identifiable from information in Defendant's possession, custody, and control.

146. <u>Commonality and Predominance</u>: Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether Defendant disclosed Class Members' communications or Disclosed Information to Third Parties;

b. Whether Class Members consented to Defendant's disclosure of their communications or Disclosed Information;

c. Whether Defendant owed duties to Plaintiff and Class Members to protect their communications or Disclosed Information;

d. Whether Defendant breached its duty to protect Plaintiff's and Class

Members' communications or Disclosed Information;

e. Whether Defendant's disclosure of Plaintiff's and Class Members' communications or Disclosed Information to Third Parties violated federal, state and local laws, or industry standards;

f. Whether Defendant's failure to allow visitors a meaningful opportunity to opt out of sharing with Third Parties violated federal, state and local laws, or industry standards;

g. Whether Defendant's conduct resulted in or was the actual cause of the disclosure of Plaintiff's and Class Members' communications or Disclosed Information;

h. Whether Defendant's conduct resulted in or was the proximate cause of the disclosure of Plaintiff's and Class Members' communications or Disclosed Information;

i. Whether Defendant has a contractual obligation to protect Plaintiff's and Class Members' communications or Disclosed Information and whether it complied with such contractual obligation;

j. Whether Defendant has a duty of confidence and whether it complied with such obligation;

k. Whether Defendant's conduct amounted to violations of state consumer protection statutes;

l. Whether Defendant's conduct amounted to violations of state and federal wiretap statutes;

m. Whether Defendant's conduct amounted to violations of other California state laws;

n. Whether Defendant should retain Plaintiff's and Class Members' valuable communications or Disclosed Information;

o. Whether, as a result of Defendant's conduct, Plaintiff and Class Members are entitled to injunctive, equitable, declaratory and/or other relief, and, if so, the nature of such relief.

147. Defendant has engaged in a common course of conduct toward Plaintiff and the Class Members, in that the Plaintiff's and Class Members' data was stored on the same computer system and unlawfully disclosed and accessed in the same way. As set forth above, the common issues arising from Defendant's conduct affecting Class Members predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

148. Typicality: Plaintiff's claims are typical of those of other Class Members because all had their communications or Disclosed Information compromised as a result of Defendant's use and incorporation of, The Trade Desk trackers, Google trackers and other tracking technology.

149. Policies Generally Applicable to the Classes: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Classes as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly, and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiff.

150. Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages Plaintiff have suffered is typical of other Class Members. Plaintiff have also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

151. Superiority and Manageability: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class

Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

152. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged. If the class action device were not used, Defendant would necessarily gain an unconscionable advantage because it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources. Moreover, the costs of individual suits could unreasonably consume the amounts that would be recovered, whereas proof of a common course of conduct to which Plaintiff were exposed is representative of that experienced by the Classes and will establish the right of each Class Member to recover on the cause of action alleged. Finally, individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

153. The litigation of the claims brought herein is manageable. Defendant's

uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

154. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

155. Unless a Class-wide injunction is issued, Defendant may continue in its unlawful use and disclosure and failure to properly secure the communications or Disclosed Information of Plaintiff and the Class Members, Defendant may continue to refuse to provide proper notification to and obtain proper consent from Class Members, and Defendant may continue to act unlawfully as set forth in this Complaint.

156. Moreover, Defendant has acted or refused to act on grounds generally applicable to the Classes, and, accordingly, final injunctive or corresponding declaratory relief regarding the whole of the Classes is appropriate.

157. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

a. Whether Defendant owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their

communications or Disclosed Information;

b. Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their communications or Disclosed Information;

c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to the disclosure of visitor information;

d. Whether Defendant was negligent and/or negligent *per se*;

e. Whether an implied contract existed between Defendant on the one hand, and Plaintiff and Class Members on the other, and the terms of that contract;

f. Whether Defendant breached the contract;

g. In the alternate, whether Defendant was unjustly enriched;

h. Whether Defendant adequately and accurately informed Plaintiff and Class Members that their communications or Disclosed Information had been used and disclosed to Third Parties and used for Third Party and fourth parties' benefit;

i. Whether Defendant failed to implement and maintain reasonable security procedures and practices;

j. Whether Defendant invaded Plaintiff and the Class Members' privacy;

k. Whether Defendant breached its implied duty of confidentiality; and,

l. Whether Plaintiff and the Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

**COUNT I**

**NEGLIGENCE**
**(On Behalf of Plaintiff and the Classes)**

158. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

159. Plaintiff and Class Members submitted sensitive nonpublic personal information, including communications and/or Disclosed Information, when accessing Defendant's website.

160. Defendant owed to Plaintiff and Class Members a duty to exercise reasonable care in handling and using Plaintiff's and Class Members' communications and Disclosed Information in its care and custody, including implementing industry-standard privacy procedures sufficient to reasonably protect the information from disclosure and unauthorized transmittal and use of communications and/or Disclosed Information that occurred.

161. Defendant acted with wanton and reckless disregard for the privacy and confidentiality of Plaintiff's and Class Members' communications or Disclosed Information by disclosing and providing access to this information to Third Parties

for the financial benefit of Third Parties (and fourth parties) and Defendant.

162. Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's disclosure of their communications or Disclosed Information to benefit Third Parties (and fourth parties) and Defendant. Defendant actively sought and obtained Plaintiff's and Class Members' communications or Disclosed Information. And Defendant knew or should have known that by integrating tracking technology on its website that Plaintiff's and Class Members' nonpublic personal information, including communications or Disclosed Information, would be disclosed to the Third Parties (and used by the fourth parties).

163. Plaintiff's and Class Members' communications and Disclosed Information are highly valuable, and Defendant knew, or should have known, the harm that would be inflicted on Plaintiff and Class Members by disclosing their communications or Disclosed Information to Third Parties. This disclosure was of benefit to the Third Parties (and fourth parties) and Defendant by way of data harvesting, advertising, and increased sales.

164. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers in the handling and securing of communications and/or Disclosed Information of Plaintiff and Class

Members. This failure actually and proximately caused Plaintiff's and Class Members' injuries.

165. As a direct, proximate, and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or imminently will suffer injury and damages, including monetary damages, inappropriate advertisements and use of their communications or Disclosed Information for advertising purposes, and increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

166. Defendant's negligence and breach of its common-law duties to exercise reasonable care directly and proximately caused Plaintiff's and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation: the unauthorized access of their communications or Disclosed Information by Third Parties (and fourth parties); improper disclosure of their communications or Disclosed Information; receipt of targeted advertisements reflecting private health information; lost benefit of their bargain; lost value of their communications or Disclosed Information and diminution in value; embarrassment, humiliation, frustration, and emotional distress; lost time and money incurred to mitigate and remediate the effects of use of their information, as to targeted advertisements that resulted from and were caused by Defendant's negligence; value to Plaintiff and the Class Members of surrendering their choices to keep their communications or

Disclosed Information private and allowing Defendant to track their data; increased risk of future harm resulting from future use and disclosure of Plaintiff's and the Class Members' communications or Disclosed Information; and other injuries and damages as set forth herein. These injuries are ongoing, imminent, immediate, and continuing.

167. Defendant's negligence directly and proximately caused the unauthorized access and disclosure of Plaintiff's and Class Members' communications or Disclosed Information, and as a result, Plaintiff and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiff and Class Members seek actual and compensatory damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence.

168. Plaintiff and Class Members seek to recover the value of the unauthorized access to their communications or Disclosed Information resulting from Defendant's wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiff may generally recover the reasonable use value of the

intellectual property—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such intellectual property to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and Class Members have a protectible property interest in their communications and Disclosed Information; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions

169. Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

**COUNT II**

**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Classes)**

170. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

171. Plaintiff being this negligence *per se* count in the alternative to their common law negligence claim.

172. Pursuant to the laws set forth herein, including the FTC Act, HIPAA, the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C and the other sections identified above, Defendant were required by law to maintain adequate and reasonable data and cybersecurity Disclosed to maintain the security and privacy of Plaintiff's and Class Members' communications or Disclosed Information.

173. Plaintiff and Class Members are within the class of persons that these statutes and rules were designed to protect.

174. Defendant had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff's and Class Members' communications or Disclosed Information.

175. Defendant owed a duty to timely and adequately inform Plaintiff and Class Members, in the event of their communications or Priv Disclosed ate Information being improperly disclosed to unauthorized Third Parties.

176. It was not only reasonably foreseeable, but it was intended, that the

failure to reasonably protect and secure Plaintiff's and Class Members' communications or Disclosed Information in compliance with applicable laws would result in unauthorized Third Parties gaining access to Plaintiff's and Class Members' communications or Disclosed Information, and resulting in Defendant's liability under principles of negligence *per se*.

177. Defendant violated its duty under Section 5 of the FTC Act, and/or state law by failing to use reasonable measures to protect Plaintiff's and Class Members' communications or Disclosed Information and not complying with applicable industry standards as described in detail herein.

178. Plaintiff's and Class Member's communications or Disclosed Information constitutes personal property that was taken and misused as a proximate result of Defendant's negligence, resulting in harm, injury and damages to Plaintiff and Class Members.

179. As a proximate result of Defendant's negligence *per se* and breach of duties as set forth above, Plaintiff and Class Members were caused to, *inter alia*, have their data shared with Third Parties without their authorization or consent, receive unwanted advertisements that reveal specific information related to seeking healthcare, fear, anxiety and worry about the status of their communications or Disclosed Information, diminution in the value of their personal data for which there is a tangible value, and/or a loss of control over their communications or Disclosed

Information, all of which can constitute actionable actual damages.

180. Defendant's conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiff's and Class Members' communications or Disclosed Information, and as a result, Plaintiff and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiff and Class Members seek actual, and compensatory damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence *per se*.

181. Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

## COUNT III

## VIOLATION OF THE COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT, CAL. PENAL CODE § 502
## (On Behalf of Plaintiff and the California Subclass)

182. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

183. The California Legislature enacted the Comprehensive Computer Data

Access and Fraud Act, Cal. Penal Code § 502 to "expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems," and finding and declaring "that the proliferation of computer technology has resulted in a concomitant proliferation of computer crime and other forms of unauthorized access to computers, computer systems, and computer data." Cal. Penal Code § 502(a).

184. In enacting the CDAFA, the Legislature further found and declared "that protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data." Cal. Penal Code § 502(a).

185. Plaintiff's and the Class Members' devices on which they accessed Defendant's website, including their computers, smart phones, and tablets, constitute computers or "computer systems" within the meaning of CDAFA. Cal. Penal Code § 502(b)(5).

186. By conduct complained of in the preceding paragraphs, Defendant violated Section 502(c)(1)(B) of CDAFA by knowingly accessing without permission Plaintiff's and Class Members' devices in order to wrongfully obtain and

use their personal data, including their communications or Disclosed Information, in violation of Plaintiff's and Class Members' reasonable expectations of privacy in their devices and data.

187. Defendant violated Cal. Penal Code § 502(c)(2) by knowingly and without permission accessing, taking, copying, and using Plaintiff's and the Class Members' communications or Disclosed Information.

188. Defendant used Plaintiff's and Class Members' data as part of a scheme to defraud them and wrongfully obtain their data and other economic benefits. Specifically, Defendant intentionally concealed from Plaintiff and Class Members that Defendant had secretly installed tracking pixels on its website that surreptitiously shared communications and/or Disclosed Information with Third Party advertising companies like The Trade Desk and Google. Had Plaintiff and Class Members been aware of this practice, they would not have used Defendant's website.

189. The computers and mobile devices that Plaintiff and Class Members used when accessing Defendant's website all have and operate "computer services" within the meaning of CDAFA. Defendant violated § 502(c) of the CDAFA by knowingly and without permission accessing and using those devices and computer services, and/or causing them to be accessed and used, *inter alia*, in connection with the Third Parties' (and fourth parties') wrongful use of such data.

190. Under § 502(b)(12) of the CDAFA a "Computer contaminant" is defined as "any set of computer instructions that are designed to . . . record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information."

191. Defendant violated § 502(c)(8) by knowingly and without permission introducing a computer contaminant via Trackers embedded into the website which intercepted Plaintiff's and the Class Members' private and sensitive medical information.

192. Defendant's violation of the CDAFA caused Plaintiff and Class Members, at minimum, the following damages:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of their relationship;

c. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value;

d. Plaintiff and Class Members did not get the full value of the services for which hepaid, which included Defendant's duty to maintain confidentiality; and

e. Defendant's actions diminished the value of Plaintiff's and Class Members' communications or Disclosed Information.

193. Plaintiff and the Class Members seek compensatory damages in accordance with Cal. Penal Code § 502(e)(1), in an amount to be proved at trial, and injunctive or other equitable relief; as well as punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) as Defendant's violations were willful and, upon information and belief, Defendant is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294; and reasonable attorney's fees under § 502(e)(2).

194. Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT IV**

**VIOLATION OF CALIFORNIA'S CONSUMER PROTECTION LAW ("UCL"),**
**CAL. BUS. & PROF. CODE §§ 17200, *et seq*.**
**(On Behalf of Plaintiff and the California subclass)**

195. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

196. Plaintiff and Defendant are each a "person" under Cal. Bus. & Prof. Code § 17201.

197. The California Business and Professions Code §§ 17201, *et seq*. prohibits acts of unfair competition, which includes unlawful business practices.

198. Defendant's business acts and practices are "unlawful" under the Unfair

Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et. seq*. (the "UCL") because, as alleged above, Defendant violated California common law, and other statutes and causes of action alleged herein.

199. Defendant engaged in unlawful acts and practices by imbedding the Pixel on its website, which tracks, records, and transmits Plaintiff's and Class Members' communications or Disclosed Information they disclose to Defendant in confidence its website to Third Parties without Plaintiff's and Class Members' knowledge and/or consent, in violation of the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*.; the Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502; and by representing that their services have characteristics, uses, or benefits that they do not have in violation of Civil Code § 1770.

200. When using Defendant's website and services, Plaintiff and Class Members relied on Defendant's status as a trusted healthcare institution.

201. Inconsistent with its role as a healthcare insurance provider, Defendant disclosed Plaintiff's and Class Members' communications or Disclosed Information to Third Parties without their consent and for marketing purposes. Thus, Defendant represented that its services have characteristics, uses, or benefits that they do not have and represented that its services are of a particular standard, quality, or grade when they were not, in violation of Cal. Civil Code § 1770.

202. Plaintiff and Class Members were reasonable to assume, and did assume, that Defendant would take appropriate measures to keep their communications or Disclosed Information secure and not share it with Third Parties or allow Third Parties (and fourth parties) to use it without their express consent. Defendant also had a duty to disclose that it was sharing their visitors' communications or Disclosed Information with Third Parties. However, Defendant did not disclose at any time that it was sharing communications or Disclosed Information with Third Parties via tracking technologies or that Third Parties (and fourth parties) were using their communications or Disclosed Information.

203. Had Plaintiff and Class Members known that Defendant would intercept, collect, and transmit their communications or Disclosed Information to Third Parties, Plaintiff and the Class Members would not have used Defendant's services.

204. Plaintiff and Class Members have a property interest in their communications or Disclosed Information. By surreptitiously collecting and otherwise misusing Plaintiff's and Class Members' communications or Disclosed Information, Defendant has taken property from Plaintiff and Class Members without providing just (or indeed any) compensation.

205. By deceptively collecting, using, and sharing Plaintiff's and Class Members' communications or Disclosed Information with Third Parties for Third

Party (and fourth parties) use, Defendant has taken money or property from Plaintiff and Class Members. Accordingly, Plaintiff seeks restitution on behalf of himself and the Class.

206. Defendant's business acts and practices also meet the unfairness prong of the UCL according to all three theories of unfairness.

207. First, Defendant's business acts and practices are "unfair" under the UCL pursuant to the three-part test articulated in *Camacho v. Automobile Club of Southern California* 142 Cal. App. 4th 1394, 1403: (a) Plaintiff and Class Members suffered substantial injury due to Defendant's Disclosure of their communications or Disclosed Information; (b) Defendant's disclosure of Plaintiff's and Class Members' communications or Disclosed Information provides no benefit to visitors, let alone any countervailing benefit that could justify Defendant's Disclosure of communications or Disclosed Information without consent for marketing purposes or other pecuniary gain; and (c) Plaintiff and Class Members could not have readily avoided this injury because they had no way of knowing that Defendant was implementing tracking technology.

208. Second, Defendant's business acts and practices are "unfair" under the UCL because they are "immoral, unethical, oppressive, unscrupulous, or substantially injurious" to Plaintiff and Class Members, and "the utility of [Defendant's] conduct," if any, does not "outweigh the gravity of the harm" to

Plaintiff and Class Members. *Drum v. San Fernando Valley Bar Ass'n,* (2010) 182 Cal. App. 4th 247, 257. Defendant secretly collected, disclosed, and otherwise misused Plaintiff's and Class Members' communications or Disclosed Information by bartering it to Third Parties in return for marketing and profit. This surreptitious, willful, and undisclosed conduct is immoral, unethical, oppressive, unscrupulous, and substantially injurious. Moreover, no benefit inheres in this conduct, the gravity of which is significant.

209. Third, Defendant's business acts and practices are "unfair" under the UCL because they run afoul of "specific constitutional, statutory, or regulatory provisions." *Drum*, 182 Cal. App. 4th at 256 (internal quotation marks and citations omitted). California has a strong public policy of protecting consumers' privacy interests, including consumers' personal data, as codified in California's Constitution in Article I, section 1; the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*.; and the CDAFA, Cal. Penal Code § 502, among other statutes.

210. Defendant violated this public policy by, among other things, surreptitiously collecting, disclosing, and otherwise exploiting Plaintiff's and Class Members' communications or Disclosed Information by sharing that information with Third Parties via tracking technologies without Plaintiff's and/or Class Members' consent.

211. Had Plaintiff and Class Members known Defendant would intercept,

collect, and transmit their communications or Disclosed Information to The Trade Desk and Google, and other Third Parties, Plaintiff and Class Members would not have used Defendant's services.

212. Plaintiff and Class Members were reasonable to assume, and did assume, that Defendant would take appropriate measures to keep their communications or Disclosed Information secure and not share it with Third Parties without their express consent. Defendant was in sole possession of and had a duty to disclose the material information that Plaintiff's and Class Members' communications or Disclosed Information would be shared with Third Parties via trackers. Defendant did not disclose at any time that they were sharing communications or Disclosed Information with Third Parties via trackers.

213. Plaintiff and Class Members have a property interest in their communications or Disclosed Information. By surreptitiously collecting and otherwise misusing Plaintiff's and Class Members' communications or Disclosed Information, Defendant has taken property from Plaintiff and Class Members without providing just (or indeed any) compensation.

214. Plaintiff and Class Members have lost money and property due to Defendant's conduct in violation of the UCL. Disclosed Information such as that which Defendant collected and transmitted to Third Parties has objective monetary value. Companies are willing to pay for such Disclosed Information, like the

information Defendant unlawfully collected and transmitted to Third Parties. For example, Pfizer annually pays approximately $12 million to purchase similarly sensitive information on health data, from various sources.[44]

215. By deceptively collecting, using, and sharing Plaintiff's and Class Members' communications or Disclosed Information with Third Parties, and by allowing Third Parties (and fourth parties) to use their communications or Disclosed Information, Defendant has taken money and/or property from Plaintiff and Class Members. Accordingly, Plaintiff seeks restitution on behalf of himself and the Class.

216. As a direct and proximate result of Defendant's unfair and unlawful methods and practices of competition, Plaintiff and Class Members suffered actual damages, including, but not limited to, the loss of the value of their Disclosed Information.

217. As a direct and proximate result of its unfair and unlawful business practices, Defendant has each been unjustly enriched and should be required to make restitution to Plaintiff and Class Members pursuant to §§ 17203 and 17204 of the California Business & Professions Code, disgorgement of all profits accruing to Defendant because of its unlawful and unfair business practices, declaratory relief, attorney fees and costs (pursuant to Cal. Code Civ. Proc. §1021.5), and injunctive or

---

[44] Adam Tanner, *How Data Brokers Make Money Off Your Medical Records*, SciAm (Feb. 1, 2016), https://www.scientificamerican.com/article/how-data-brokers-make-money-off-your-medical-records/ (last visited Jul. 16, 2025).

other equitable relief.

## COUNT V

## VIOLATION OF CALIFORNIA CONSUMER PRIVACY ACT, Cal. Civ. Code § 1798.100, *et seq*. (On Behalf of Plaintiff and the California subclass)

218. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

219. The CCPA grants consumers rights, including the right to know what personal information is being collected about them and whether that information is sold or disclosed and to whom, the right to prohibit the sale of their personal information, the right to request deletion of their personal information, and the right to nondiscrimination in service and price when they exercise privacy rights. Cal. Civ. Code § 1798.100, *et seq*.

220. The CCPA dictates specifically that "[a] third party shall not sell or share personal information about a consumer that has been sold to, or shared with, the third party by a business unless the consumer has received explicit notice and is provided an opportunity to exercise the right to opt-out." Cal. Civ. Code § 1798.115 (emphasis added).

221. CCPA states that "law relating to consumers' personal information should be construed to harmonize with the provisions of this title." Cal. Civ. Code § 1798.175. The CCPA further explicitly states that "in the event of a conflict between

other laws and the provisions of this title, the provisions of the law that afford the greatest protection for the right of privacy for consumers shall control." *Id.* Thus, the 'opt-out requirements' under the CCPA apply in this online context.

222. Defendant collected Plaintiff's and Class Members communications and/or Disclosed Information, including their personal information, with the purpose of providing healthcare services in the course of and as part of its business in California.

223. Plaintiff allege that Defendant allowed Third Parties to embed trackers, such as The Trade Desk and Google, on its website and that these Trackers transmitted Plaintiff's personal information.

224. Disclosing Plaintiff's and Class Members' communications or Disclosed Information to Third Parties was not reasonably necessary or proportionate to perform the reasonably expected healthcare services that they applied for or received.

225. By collecting, using, and selling Plaintiff's and Class Members' personal information and location data to Third Parties for Third Party (and fourth party) use, all without providing consumers with notice, Defendant violated the CCPA.

226. By failing to inform visitors like Plaintiff and Class Members of the personal information collected about them and the Third Parties with whom that

personal information was shared, and the Third Parties' (and fourth parties') use of that personal information, Defendant violated the CCPA.

227. By failing to abide by visitors' requests to delete collected personal information, Defendant violated the CCPA.

228. Pursuant to Cal. Civ. Code § 1798.150(b), Plaintiff will send Defendant notice of their CCPA claims shortly after the date of this filing. If Defendant does not correct its business practices, Plaintiff will amend (or seek leave to amend) the complaint to add claims for monetary relief, including statutory and actual damages under the CCPA. To date, Defendant has failed to cure the CCPA violation.

229. As a result of Defendant's reckless violations, Plaintiff are entitled to actual damages, statutory damages, and attorneys' fees and costs. Cal. Civ. Code § 1798.150.

## COUNT VI

## BREACH OF EXPRESS AND IMPLIED CONTRACT
**(On Behalf of Plaintiff and the Classes)**

230. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

231. Plaintiff and Class Members also entered into an express and implied contract with Defendant when they obtained healthcare from Defendant, or otherwise provided nonpublic personal information, including communications or Disclosed Information, to Defendant.

232. As part of these transactions, Defendant explicitly and implicitly agreed to safeguard and protect Plaintiff's and Class Members' communications or Disclosed Information.

233. Plaintiff and Class Members entered into express and implied contracts with the reasonable expectation (based on Defendant's own express and implied promises) that Defendant would keep their nonpublic personal information, including Disclosed Information, confidential. Plaintiff and Class Members believed that Defendant would use part of the monies paid to Defendant under the express and implied contracts to keep their nonpublic personal information, including Disclosed Information, confidential.

234. Plaintiff and Class Members would not have provided and entrusted their nonpublic personal information, including communications and/or Disclosed Information, or would have paid less for Defendant's services in the absence of the express and implied contract or implied terms between them and Defendant. The safeguarding of the nonpublic personal information, including communications and Disclosed Information, of Plaintiff and class members was critical to realize the intent of the parties.

235. As extensively detailed above, Defendant breached its express and implied contracts with Plaintiff and class members to protect their nonpublic personal information, including communications and Disclosed Information, when

it disclosed that information to Third Parties.

236. As a direct and proximate result of Defendant's breach of express and implied contract, Plaintiff and Class Members sustained actual losses and damages as described in detail above.

**COUNT VII**

**UNJUST ENRICHMENT (AS ALTERNATIVE TO CONTRACT CLAIMS)**
**(On Behalf of Plaintiff and the Classes)**

237. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

238. Plaintiff and Class Members have an interest, both equitable and legal and financial, in their communications and/or Disclosed Information, that was conferred upon, collected by, and maintained by Defendant and that was ultimately disclosed without their consent.

239. Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of valuable, sensitive, personal, and healthcare information—communications and/or Disclosed Information—that Defendant collected from Plaintiff and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, for marketing purposes, and for sale or trade with Third Parties. Defendant did not share this benefit with Plaintiff and Class Members.

240. Plaintiff and Class Members would not have used Defendant's services,

or would have paid less for those services, if they had known that Defendant would collect, use, and disclose their communications or Disclosed Information to Third Parties or allow Third Parties (and fourth parties) to use their communications or Disclosed Information.

241. Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiff and Class Members.

242. The benefits that Defendant derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members themselves. Under unjust enrichment principles, it would be inequitable for Defendant to retain the profit and/or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

243. Defendant continues to benefit and profit from its retention and use of Plaintiff's and Class Members' communications or Disclosed Information, while its value to Plaintiff and Class Members has been diminished.

244. Plaintiff plead this claim separately as well as in the alternative to claims for damages under Fed. R. Civ. P. 8(a)(3), because if the Court dismisses Plaintiff's claims for damages or enters judgment on them in favor of the Defendant, Plaintiff's will have no adequate legal remedy. Plaintiff make the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in her other causes of action, in the event that such causes of action do

not succeed. Plaintiff and the Class Members may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action, and, if so, will lack an adequate remedy at law.

245. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds it received as a result of the conduct and the unauthorized Disclosure alleged herein

**COUNT VIII**

**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiff and the Class)**

246. Plaintiff reallege and incorporates the above allegations as if fully set forth herein.

247. A relationship existed between Plaintiff and the Class, on the one hand, and Defendant, on the other, in which Plaintiff and the Class put their trust in Defendant to protect the communications or Disclosed Information of Plaintiff and the Class, and Defendant accepted that trust.

248. Defendant breached the fiduciary duty that it owed to Plaintiff and the Class Members by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect, and intentionally disclosing, their communications or Disclosed Information.

249. Defendant's breach of fiduciary duty was a legal cause of injury-in-fact and damage to Plaintiff and the Class, as alleged herein.

250. But for Defendant's breach of fiduciary duty, the injury-in-fact and damage to Plaintiff and the Class would not have occurred.

251. Defendant's breach of fiduciary duty substantially contributed to Plaintiff's and Class Members' damages.

252. As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiff and Class Members are entitled to and do demand actual, compensatory, nominal and punitive damages, injunctive relief, and all other relief allowed by law.

**COUNT IX**

**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiff the Nationwide Class, and the California Subclass)**

253. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

254. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, the Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this complaint.

255. An actual controversy has arisen regarding Defendant's present and prospective common law and other duties to keep visitors' communications and Disclosed Information confidential and whether Defendant is currently keeping that

information confidential. Plaintiff and similar Class Members thus remain at imminent risk that additional disclosure of their communications or Disclosed Information will occur in the future.

256. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant continues to owe a legal duty to secure visitors' communications or Disclosed Information, under the common law, HIPAA, Section 5 of the FTC Act, and various state statutes;

b. Defendant continues to breach this legal duty by disclosing visitors' communications or Disclosed Information to unaffiliated Third Parties.

257. The Court also should issue corresponding prospective injunctive relief requiring Defendant to keep its nonpublic personal information, including communications and Disclosed Information, confidential consistent with law and industry standards.

258. If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy. The risk of additional disclosure is real, immediate, and substantial as the Trackers remain operative on Defendant's website to this day. If additional disclosure occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits

to rectify the same conduct.

259. The hardship to Plaintiff and Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if Defendant continues to disclose visitors' communications or Disclosed Information, Plaintiff and Class Members will likely be subjected to the harms described herein. On the other hand, the cost to Defendant of complying with an injunction by keeping visitors' communications or Disclosed Information confidential is relatively minimal (for example, removing trackers from its website), and Defendant has a pre-existing legal obligation to do so.

260. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing Defendant's additional unlawful disclosures of visitors' communications or Disclosed Information, thus eliminating the additional injuries that would result to Plaintiff and the hundreds of thousands of visitors whose information has been and will continue to be disclosed.

**COUNT X**

**BREACH OF CONFIDENCE**
**(On Behalf of Plaintiff, the Nationwide Class, and the California Subclass)**

261. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

262. At all times during Plaintiff's and Class Members' interactions with

Defendant, Defendant was fully aware of the confidential and sensitive nature of Plaintiff's and Class Members' communications and/or Disclosed Information.

263. As alleged herein and above, Defendant's relationship with Plaintiff and Class Members was governed by terms and expectations that Plaintiff's and Class Members' communications or Disclosed Information, would be collected, stored, and protected in confidence, and would not be disclosed to Third Parties, or used by Third Parties (and fourth parties) without notice and consent.

264. Plaintiff and Class Members provided Defendant with their communications or Disclosed Information, with the explicit and implicit understandings that Defendant would protect and not permit that information to be disseminated to and used by unaffiliated Third Parties (and fourth parties) without notice, consent, and sufficient opportunity to opt out.

265. Defendant voluntarily received in confidence Plaintiff's and Class Members' communications or Disclosed Information, with the understanding and affirmative representation to visitors that the information would not be disclosed or disseminated to unaffiliated Third Parties for Third Parties' (and fourth parties') marketing purposes.

266. Defendant disclosed Plaintiff's and Class Members' communications or Disclosed Information, without notice, without express permission, and without opportunity to opt out.

267. But for Defendant's Disclosure of Plaintiff's and Class Members' Disclosed Information, in violation of the parties' understanding of confidence, their communications or Disclosed Information would not have been disclosed to Third Parties, or used for Third Party (and fourth party) marketing and profit, without their consent.

268. The injury and harm Plaintiff and Class Members suffered was the reasonably foreseeable result of Defendant's nonconsensual disclosure of Plaintiff's and Class Members' communications or Disclosed Information. Defendant knew it was disclosing Plaintiff's and Class Members' communications or Disclosed Information to Third Parties, for Third Party (and fourth party) use, without their consent.

269. As a direct and proximate result of Defendant's breaches of confidence, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial.

270. Plaintiff seeks all monetary and non-monetary relief allowed by law.

**COUNT XI**

**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE §§ 631**
**(On Behalf of Plaintiff and the California subclass)**

271. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

272. The California Legislature enacted the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 630, *et seq*. declaring that:

> advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.
>
> The Legislature by this chapter intends to protect the right of privacy of the people of this state.

Cal. Penal Code § 630.

273. To establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

274. Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

275. Defendant's website and the tracking technologies Defendant intentionally installed on it are prohibited, as they constitute a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

276. All alleged communications between individual Plaintiff or Class Members and Defendant qualify as protected communications under CIPA because

each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

277. CCPA and CIPA are complementary statutes. CCPA states that "law relating to consumers' personal information should be construed to harmonize with the provisions of this title." Cal. Civ. Code § 1798.175. CCPA further explicitly states that "in the event of a conflict between other laws and the provisions of this title, the provisions of the law that afford the greatest protection for the right of privacy for consumers shall control." *Id.* The 'opt-out requirements' under the CCPA apply in this online context.

278. As alleged in the preceding paragraphs, by use of tracking technology, Defendant used a recording device to record the confidential communications in transit including communications or Disclosed Information without the consent of Plaintiff or Class Members and then transmitted such information to Third Parties for Third Party (and fourth party) use.

279. At all relevant times, Defendant's aiding of Third Parties to learn the contents of communications and Defendant's recording of confidential communications was without Plaintiff's and the Class Members' authorization and consent.

280. Plaintiff and Class Members had a reasonable expectation of privacy regarding the confidentiality of their communications with Defendant. Defendant had duties under statutory and common law to safeguard visitors communications and/or Disclosed Information, and not disclose it without authorization. Defendant never received any authorization and disclosed Plaintiff's and the Class's communications or Disclosed Information regardless.

281. Defendant engaged in and continued to engage in interception by aiding others (including The Trade Desk and Google) to secretly record the contents of Plaintiff's and Class Members' wire communications.

282. The intercepting devices used in this case include, but are not limited to:

a. Those to which Plaintiff's and Class Members' communications were disclosed;
b. Plaintiff's and Class Members' personal computing devices;
c. Plaintiff's and Class Members' web browsers;
d. Plaintiff's and Class Members' browser-managed files;
e. Trackers like The Trade Desk tracker;
f. Trackers like the Google tracker;
g. Trackers like the Microsoft tracker;
h. Internet cookies;

i. Other pixels, trackers, and/or tracking technology installed on Defendant's website and/or server;

j. Defendant's computer servers;

k. Third Party source code utilized by Defendant; and

l. Third Party computer servers (including The Trade Desk and Google).

283. Defendant aided in the interception of contents in that the data from the communications between Plaintiff and/or Class Members and Defendant that were redirected to and recorded by the Third Parties include information which identifies the parties to each communication, their existence, and their contents.

284. Plaintiff and Class Members reasonably expected that their communications and Disclosed Information were not being intercepted, recorded, and disclosed to Third Parties or used by Third Parties (and fourth parties) for marketing and profit.

285. No legitimate purpose was served by Defendant's willful and intentional disclosure of Plaintiff's and Class Members' communications or Disclosed Information to Third Parties. Neither Plaintiff nor Class Members consented to the disclosure of their communications or Disclosed Information by Defendant to Third Parties or the use of the communications or Disclosed Information by Third Parties (and fourth parties).

286. The Trackers that Defendant used are designed such that they

transmitted each of a website user's actions to Third Parties alongside and contemporaneously with the user initiating the communication. Thus, Plaintiff's and Class Members' communications were intercepted in transit to the intended recipient (Defendant) before they reached Defendant's servers.

287. Defendant willingly facilitated the Third Parties' interception and collection of Plaintiff's and Class Members' communications or Disclosed Information, and the Third Parties' (and fourth parties') use of their communications or Disclosed Information, by embedding the Trackers on its website. Moreover, Defendant had full control over these Trackers, including which webpages contained the pixels, what information was tracked and shared, and how events were categorized prior to transmission.

288. Defendant gave substantial assistance to Third Parties in violating the privacy rights of visitors to Defendant's website, even though Defendant's conduct constituted a breach of the confidentiality duties that it owed, including the duty healthcare institutions owe to their insured and insureds' property. Defendant knew that the installation of the Trackers on its website would result in the unauthorized disclosure of visitors' communications to Third Parties, and Third Party (and fourth party) use of those communications, yet nevertheless did so anyway.

289. Plaintiff's and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or

wrongful purpose of monetizing their communications or Disclosed Information, including using their communications or Disclosed Information to develop marketing and advertising strategies.

290. The communications or Disclosed Information that Defendant assisted Third Parties with reading, learning, and exploiting, included Plaintiff's and Class Members' communications or Disclosed Information visitors input into and accessed on Defendant's website. Defendant disclosed details about visitors, like Plaintiff and Class communications or Disclosed Information and their interactions with Defendant's website, their status as medical patients; their searches for health conditions or concerns; and identifying information including IP addresses and identifying cookies.

291. Plaintiff and the Class Members seek statutory damages under Cal. Penal Code § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

292. In addition to statutory damages, Defendant's violations caused Plaintiff and Class Members the following damages.

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private.

b. Defendant eroded the essential confidential nature of the patient-doctor

relationship.

c. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value;

d. Plaintiff and Class Members did not get the full value of the healthcare services for which they paid, which included Defendant's duty to maintain confidentiality; and

e. Defendant's actions diminished the value of Plaintiff's and Class Members' communications or Disclosed Information.

293. Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

## COUNT XII

## VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE §§ 632

**(On Behalf of Plaintiff and the California subclass)**

294. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

295. CIPA § 632(a) prohibits an entity from intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication,

whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

296. As alleged in the preceding paragraphs, by use of tracking technology, Defendant used a recording device to record the confidential communications including Disclosed Information without the consent of Plaintiff or Class Members and then transmitted such information to Third Parties for Third Party (and fourth party) use.

297. At all relevant times, Defendant's aiding of Third Parties to learn the contents of communications and Defendant's recording of confidential communications was without Plaintiff's and the Class Members' authorization and consent.

298. Plaintiff and Class Members had a reasonable expectation of privacy regarding the confidentiality of their communications with Defendant. Defendant had duties under statutory and common law to safeguard visitors' communications and Disclosed Information, and not disclose it without authorization. Defendant never received any authorization and disclosed Plaintiff's and the Class's communications and Disclosed Information regardless.

299. Defendant engaged in and continued to engage in interception by aiding others (including The Trade Desk and Google) to secretly record Plaintiff's and Class Members' wire communications.

300. The intercepting devices used in this case include, but are not limited to:

a. Those to which Plaintiff's and Class Members' communications were disclosed;

b. Plaintiff's and Class Members' personal computing devices;

c. Plaintiff's and Class Members' web browsers;

d. Plaintiff's and Class Members' browser-managed files;

e. Trackers like The Trade Desk tracker;

f. Trackers like the Google tracker;

g. Trackers like the Microsoft tracker;

h. Internet cookies;

i. Other pixels, trackers, and/or tracking technology installed on Defendant's website and/or server;

j. Defendant's computer servers;

k. Third Party source code utilized by Defendant; and

l. Third Party computer servers (including The Trade Desk and Google).

301. Defendant aided in the interception of contents in that the data from the communications between Plaintiff and/or Class Members and Defendant that were redirected to and recorded by the Third Parties include information which identifies the parties to each communication, their existence, and their contents.

302. Plaintiff and Class Members reasonably expected that their communications or Disclosed Information were not being intercepted, recorded, and disclosed to Third Parties or used by Third Parties (and fourth parties) for marketing and profit.

303. No legitimate purpose was served by Defendant's willful and intentional disclosure of Plaintiff's and Class Members' communications or Disclosed Information to Third Parties. Neither Plaintiff nor Class Members consented to the disclosure of their communications or Disclosed Information by Defendant to Third Parties or the use of the communications or Disclosed Information by Third Parties (and fourth parties).

304. The Trackers that Defendant used are designed such that they transmitted each of a website user's actions to Third Parties alongside and contemporaneously with the user initiating the communication. Thus, Plaintiff's and Class Members' communications were intercepted in transit to the intended recipient (Defendant) before they reached Defendant's servers.

305. Defendant willingly facilitated the Third Parties' interception and collection of Plaintiff's and Class Members' communications or Disclosed Information, and the Third Parties' (and fourth parties') use of their communications or Disclosed Information, by embedding Trackers on its website. Moreover, Defendant had full control over these Trackers, including which webpages contained

the pixels, what information was tracked and shared, and how events were categorized prior to transmission.

306. Defendant gave substantial assistance to Third Parties in violating the privacy rights of visitors to Defendant's website, even though Defendant's conduct constituted a breach of the confidentiality duties that it owed, including the duty healthcare institutions owe to their website visitors and those visitors' property. Defendant knew that the installation of the Trackers on its website would result in the unauthorized disclosure of visitors communications to Third Parties, and Third Party (and fourth party) use of those communications, yet nevertheless did so anyway.

307. Plaintiff's and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their communications or Disclosed Information, including using their communications or Disclosed Information to develop marketing and advertising strategies.

308. The communications or Disclosed Information that Defendant assisted Third Parties with reading, learning, and exploiting, included Plaintiff's and Class Members' communications and Disclosed Information visitors input into and accessed on Defendant's website. Defendant disclosed details about visitors, like Plaintiff and Class communications and Disclosed Information and their interactions

with Defendant's website, their status as medical patients; their searches for health conditions or concerns; and identifying information including IP addresses and identifying cookies.

309. Plaintiff and the Class Members seek statutory damages under Cal. Penal Code § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

310. In addition to statutory damages, Defendant's violations caused Plaintiff and Class Members the following damages.

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private.

b. Defendant eroded the essential confidential nature of the patient-doctor relationship.

c. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value;

d. Plaintiff and Class Members did not get the full value of the healthcare services for which they paid, which included Defendant's duty to maintain confidentiality; and

e. Defendant's actions diminished the value of Plaintiff's and Class Members' communications or Disclosed Information.

311. Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT XIII**

**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE §§ 638.51, *et seq*.**
**(On Behalf of Plaintiff and the California subclass)**

312. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

313. CIPA § 638.51 prohibits the installation or use of "a pen register or trap and trace device without first obtaining a court order." Cal. Penal Code § 638.51(a).

314. Defendant repeatedly violated CIPA § 638.51(a) by installing and using the Trackers without a court order and without any valid consent from users. Defendant's continued use of Trackers after a user clicked "Decline all," as described in detail above, demonstrates that no valid consent was obtained. Instead, Defendant relied on a knowingly deceptive interface that falsely conveyed user control while continuing to intercept and transmit private communications.

315. An "electronic communication" is defined as "any transfer of signs, signals, writings, images, sounds, data, or intelligence of any nature in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo-optical system[.]" Cal.

Penal Code § 629.51(a)(2).

316. All communications between individual Plaintiff or Class Members and Defendant qualify as protected communications under CIPA because each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

317. California Penal Code § 638.50(b) defines a "pen register" as "a device or process that records or decodes dialing, routing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

318. The Trackers are "pen registers" under § 638.50(b) of CIPA because they record "routing, addressing, or signaling information" transmitted by the devices of visitors to Defendant's website. Cal. Penal Code § 638.50(b).

319. California Penal Code § 638.50(c) defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."

320. The Trackers are also "trap and trace devices" under CIPA § 638.50(c)

because they "capture the incoming electronic or other impulses that identify . . . dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication[.]" Cal. Penal Code § 638.50(c).

321. During the Class Period, Defendant installed the Trackers on its website and used them to capture and transmit addressing information, including Plaintiff's and Class Members' IP addresses and other unique identifiers to Third Parties.

322. Plaintiff and Class Members did not provide their consent prior to Defendant's installation and use of the Trackers. On information and belief, Defendant also did not obtain a court order to install or use the Trackers.

323. Under California Penal Code § 637.2, Plaintiff and Class members have been injured by Defendant's violations of California Penal Code § 638.51(a), and each seek statutory damages of $5,000 per violation.

324. Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT XIV**

**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. §§ 2511(1), *et seq.***
**(On Behalf of Plaintiff and the Classes)**

325. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

326. The ECPA protects both sending and receipt of communications. 18

U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

327. The transmissions of Plaintiff's and Class Members' communications and/or Disclosed Information to Defendant's website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

328. **Electronic Communications**. The transmission of communications or Disclosed Information between Plaintiff and Class Members and Defendant's website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

329. **Content**. The ECPA defines content, when used with respect to electronic communications, to "include [] any information concerning the substance, purport, or meaning of that communication." *See* 18 U.S.C. § 2510(8).

330. **Interception**. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents…include any information concerning the substance, purport, or meaning of that communication." *See* 18

U.S.C. § 2510(4), (8).

331. **Electronic, Mechanical or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiff's and Class Members' browsers;

b. Plaintiff's and Class Members' computing devices;

c. Defendant's web-servers;

d. Defendant's website; and

e. The tracking technology deployed by Defendant effectuated the sending and acquisition of visitors' communications.

332. By utilizing and embedding the tracking technology on its website, Defendant intentionally intercepted, endeavored to intercept and procured another person to intercept the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

333. Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the tracking technology which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' communications or Disclosed Information to Third Parties.

334. Defendant's intercepted communications include, but are not limited to,

communications to/from Plaintiff and Class Members regarding Disclosed Information. Specifically, AH shares information including but not limited to the text users type into a search bar with The Trade Desk and (historically) with Google. All of the named Plaintiff recall using the search bar on the AH website to search for treatment information, doctors, or support groups. AH shared the text of the searches they entered with Third Parties. For example, Plaintiff Johnt Doe uses AH for obstetrics and gynecology. Any searches she entered related to that treatment were shared with Third Parties, without her knowledge and against her explicit instructions to AH via its cookie banner.

335. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to Third Parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

336. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

337. **Unauthorized Purpose.** Defendant intentionally intercepted the

contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State – namely, invasion of privacy, among others.

338. Defendant intentionally used the wire or electronic communications to increase its profit margins and save on marketing costs.

339. Defendant specifically used tracking technology to track and to utilize Plaintiff's and Class Members' communications or Disclosed Information for financial gain.

340. Defendant was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

341. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy via the tracking technology.

342. In sending and in acquiring the content of Plaintiff's and Class Members' communications relating to the browsing of its website, Defendant's purpose was tortious, criminal and designed to violate federal and state legal provisions, including as described above the following: (i) a knowing intrusion into a private, place, conversation or matter that would be highly offensive to a reasonable person; and (ii) violation of HIPAA, the FTC Act, invading Plaintiff's and Class Members' privacy, and in breach of its fiduciary duty of confidentiality.

**COUNT XV**

**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. § 2511(3)(a)**
**UNAUTHORIZED DIVULGENCE BY ELECTRONIC COMMUNICATIONS SERVICE**
**(On Behalf of Plaintiff, the Nationwide Class, and the California Subclass)**

343. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

344. The ECPA statute provides that "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such person or entity, or an agent thereof) while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." 18 U.S.C. § 2511(3)(a).

345. **Electronic Communication Service**. An "electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). Defendant's website is an electronic communication service which provides to users thereof, customers of Defendant, the ability to send or receive electronic communications; in the absence of Defendant's website, internet users could not send or receive communications regarding Plaintiff's and Class Members' Disclosed Information.

346. **Intentional Divulgence**. Defendant intentionally embedded the

tracking technology and was or should have been aware that, if so configured, it could divulge Plaintiff's and Class Members' communications or Disclosed Information. Upon information and belief, Defendant's divulgence of the contents of Plaintiff's and Class Members' communications was contemporaneous with their exchange with Defendant's website, to which they directed their communications.

347. Defendant divulged the contents of Plaintiff's and Class Members' electronic communications without authorization and/or consent.

348. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff and Class Members regarding communications or Disclosed Information. Specifically, AH shares information including but not limited to the text users type into a search bar with at least The Trade Desk and (historically) with Google. All of the named Plaintiff used the search bar on the AH website to search for treatment information, doctors, and/or other support. AH shared the content of their searches with The Trade Desk and Google via the Trackers AH installed on its website.

349. **Exceptions do not apply**. In addition to the exception for communications directly to an electronic communications service ("ECS")[45] or an agent of an ECS, the ECPA states that

[45] An ECS is "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

> [a] person or entity providing electronic communication service to the public may divulge the contents of any such communication"…"as otherwise authorized in section 2511(2)(a) or 2517 of this title; "with the lawful consent of the originator or any addressee or intended recipient of such communication;" c. "to a person employed or authorized, or whose facilities are used, to forward such communication to its destination;" or d. "which were inadvertently obtained by the service provider and which appear to pertain to the commission of a crime, if such divulgence is made to a law enforcement agency.

U.S.C. § 2511(3)(b).

350. Section 2511(2)(a)(i) provides:

> It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

351. Defendant's divulgence of the contents of Plaintiff's and Class Members' communications to Third Parties like Google and The Trade Desk were not authorized by 18 U.S.C. § 2511(2)(a)(i) in that it was neither: (i) a necessary incident to the rendition of Defendant's service nor (ii) necessary to the protection of the rights or property of Defendant.

352. Section 2517 of the ECPA relates to investigations by government officials and has no relevance here.

353. Defendant's divulgence of the contents of Plaintiff's and the Class Members' communications on its website through the tracking technology was not done "with the lawful consent of the originator or any addresses or intended recipient of such communication[s]." As alleged above: (i) Plaintiff and Class Members did not authorize Defendant to divulge the contents of their communications and (ii) Defendant did not procure the "lawful consent" from the website or apps with which Plaintiff and Class Members were exchanging information.

354. Moreover, Defendant divulged the contents of Plaintiff's and Class Members' communications through tracking technology to individuals who are not "person[s] employed or whose facilities are used to forward such communication to its destination."

355. The contents of Plaintiff's and Class Members' communications did not appear to pertain to the commission of a crime and Defendant did not divulge the contents of their communications to a law enforcement agency.

356. As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages, preliminary and other equitable or declaratory relief as may be appropriate, punitive damages in an amount to be determined by a jury and a reasonable attorney's fee and other litigation costs reasonably incurred.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, pray for judgment as follows:

A. For an Order certifying this action as a Class action and appointing Plaintiff as Class Representatives and Plaintiff's counsel as Class Counsel;

B. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

C. For an award of punitive damages, as allowable by law;

D. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' communications or Disclosed Information and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

E. For an Order declaring the rights and obligations of the parties, including, without limitation, that Defendant owes a legal duty to its website visitors to secure their communications or Disclosed Information and that Defendant violates this legal duty by disclosing visitors' communications or Disclosed Information to unaffiliated Third Parties;

F. For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity the type of communications or Disclosed Information compromised and unlawfully disclosed to Third Parties;

G. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

H. For an Order compelling Defendant to pay for not less than three years of credit monitoring services for Plaintiff and the Classes;

I. For an award of reasonable attorneys' fees and costs under the laws outlined above, the common fund doctrine, and any other applicable law;

J. Costs and any other expenses, including expert witness fees incurred by Plaintiff in connection with this action;

K. Pre- and post-judgment interest on any amounts awarded; and

L. Such other and further relief as this court may deem just and proper.

## JURY DEMAND

Plaintiff, individually and on behalf of all others similarly situated, hereby demand a trial by jury on all issues so triable.

Dated: September 2, 2025

Respectfully submitted,

/s/ Vess A. Miller
Vess A. Miller, No. 278020
Natalie Lyons, No. 293026
COHENMALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
vmiller@cohenmalad.com
nlyons@cohenmalad.com

Carly M. Roman, No. 349895
Strauss Borrelli, PLLC
2261 Market Street, Suite 22946
San Francisco, CA, 94114
(872) 263-1100
(872) 263-1109 (facimile)
croma@straussborrelli.com

*To seek admission *pro hac vice*

***Counsel for Plaintiff and the Proposed Classes***